Elizabeth C. Pritzker (SBN 146267)
Jonathan K. Levine (SBN 220289)
Bethany Caracuzzo (SBN 190687)
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
jkl@pritzkerlevine.com
bc@pritzkerlevine.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD ESPINOSA, an individual and ANDREW WESTLEY, an individual, on behalf of themselves and all others similarly situated, <br><br>          Plaintiffs, <br><br>    v. <br><br> QUALCOMM INCORPORATED, a Delaware company, <br><br>          Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** <br><br> **1.** Section 2 of the Sherman Act, 15 U.S.C. § 2 <br><br> **2.** Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et. seq.* <br><br> **3.** Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* <br><br><br> **JURY TRIAL DEMAND** |

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ...................................................................................1

II.   PARTIES ..............................................................................................................2

III.  JURISDICTION AND VENUE ..............................................................................3

IV.   INTRADISTRICT ASSIGNMENT.........................................................................3

V.    FACTUAL BACKGROUND .................................................................................4

      A.    Brief Overview Of The Wireless Industry: SSOs, SEPs and FRAND Commitments .....4

      B.    Qualcomm's Anticompetitive Practices In The Wireless Industry ...................................5

            1.    Qualcomm Has Historically Maintained a Powerful Patent Portfolio in Mobile
                  CDMA and LTE Technologies ...........................................................................5

            2.    Qualcomm's Clear Violatio of its FRAND Promises ................................................6

            3.    Qualcomm's Royalty Rates Are Significantly Higher Than Others in the Industry ..7

      C.    Qualcomm's Conduct Has Been Investigated And Fined By Competition Regulators
            Throughout The World .......................................................................................9

      D.    Plaintiff And The Classes Were Harmed As A Direct Result Of Qualcomm's
            Monopolistic Conduct.....................................................................................11

VI.   ANTITRUST INJURY ........................................................................................12

VII.  MARKET DEFINITION .....................................................................................12

VIII. CLASS ACTION ALLEGATIONS ......................................................................13

IX.   CLAIMS FOR RELIEF .......................................................................................15

X.    REQUEST FOR RELIEF .....................................................................................17

DEMAND FOR JURY TRIAL ........................................................................................18

Plaintiffs Todd Espinosa and Andrew Westley (hereinafter, "**Plaintiffs**"), by and through their undersigned attorneys, individually and on behalf of a class of all those similarly situated, bring this class action and allege as follows based on counsel's investigation, research and review of publicly available documents, on Plaintiffs' personal knowledge, and upon information and belief:

## I.    NATURE OF THE ACTION

1.        Defendant Qualcomm Incorporated ("**Qualcomm**"), as the largest provider of mobile chips in the world, holds a monopolistic position in both the modem chipset market and standard essential patent ("**SEPs**") markets (as discussed in further detail below). This action is brought against Qualcomm for abusing this monopoly and, as a result, causing millions of consumers worldwide to pay artificially-inflated prices for wireless devices containing their modems chipsets.

2.        Plaintiffs are purchasers of products that use cellular technology such as Qualcomm's modem chipsets, including cellular telephones and computer tablets ("Cellular Devices"). Plaintiffs and the Class of individuals they seek to represent have been harmed by paying artificially inflated prices for the Cellular Devices they purchased.

3.        Qualcomm's unlawful conduct has not been only contained in the United States. Indeed, Qualcomm's anticompetitive conduct has been met with severe condemnation by regulators throughout the world.[1] In essence, Qualcomm has now "parlayed its pioneering role in cellular technology into a patent-licensing business that generates most of its profits. Qualcomm charges a royalty on nearly every smartphone made, whether or not the device uses its chips… [a]s a result, Qualcomm has reaped more than $50 billion in licensing revenues since 2000" (emphasis added).[2]

4.        Plaintiffs bring this action on behalf of themselves and others similarly situated to recover for their injuries resulting from Qualcomm's violations of Section 2 of the Sherman Act, as well as

---

[1]    Just last month, the United States Federal Trade Commission ("**FTC**") filed an action against Qualcomm in this court challenging Qualcomm's abuse of their modem chipset market monopoly and alleging that Qualcomm has excluded competitors and harmed competition – resulting in increased prices paid by consumers of cellphones and tablets. *See Federal Trade Commission v. Qualcomm Inc.,* Case No. 17-cv-00220-LHK (filed N.D. Cal. Jan. 17, 2017) ("FTC Complaint").

[2]    Don Clark's "Qualcomm's Main Profit Driver is Under Pressure," by The Wall Street Journal (Apr. 13, 2015) at https://www.wsj.com/articles/qualcomms-main-profit-driver-is-under-pressure-1428967051 (last accessed on February 20, 2017).

violations of state antitrust and consumer protection laws, from January 17, 2013 through the present ("Class Period"). Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which they are entitled for Qualcomm's unlawful conduct.

## II.    PARTIES

### A.    Plaintiffs

5.     Plaintiff **Todd Espinosa** is a California resident, who lives and works in the County of San Mateo and who, in September 2015, purchased an Apple iPhone 6S containing a Qualcomm modem chipset, which is similar to all Cellular Phones subjected to having a Qualcomm modem chipset, during the respective Class Period for his own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because he paid a higher price than he would have in the absence of Defendant's conduct as alleged herein.

6.     Plaintiff **Andrew Westley** is a California resident, who lives and works in the City and County of San Francisco and who, in August and September 2016, respectively, purchased a Samsung Galaxy Tab-E Tablet and an Android Cellular Phone containing a Qualcomm modem chipset, which is similar to all Tablets and Cellular Phones subjected to having a Qualcomm modem chipset, during the respective Class Period for his own use and not for resale. Plaintiff has been injured in California and is threatened with further injury because he paid a higher price than he would have in the absence of Defendant's conduct as alleged herein.

### B.    Defendant

7.     Defendant Qualcomm Incorporated ("**Qualcomm**") is a Delaware corporation having its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm is an American multinational semiconductor and telecommunications equipment company that designs and markets wireless telecommunications products and services, and provides these services primarily through two business segments – Qualcomm CDMA Technologies and Qualcomm Technology Licensing. Qualcomm regularly conducts business in this District and many of its licensees are also

CLASS ACTION COMPLAINT

located in this District.

## III.   JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137. This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that:

(a) This is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from some defendants; and

(b) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

9.      Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here. Qualcomm is engaged in interstate commerce, and its activities, including those activities that form the basis of this Complaint, substantially impact interstate commerce.

## IV.   INTRADISTRICT ASSIGNMENT

10.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c) – (e), the intradistrict assignment should be to the San Jose division. This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm, as well as third parties including various OEMs, also have offices in San Jose, Santa Clara, or both. The FTC also filed a case in the San Jose Division concerning the practices at issue here. *Federal Trade Commission v. Qualcomm Inc.,* Case No. 17-cv-00220 - LHK (filed N.D. Cal. Jan. 17, 2017).

//

//

//

1

2

## V.      FACTUAL BACKGROUND

### A.      Brief Overview Of The Wireless Industry: SSOs, SEPs And FRAND Commitments

3       11.     Arguably, the most important features in wireless technology are interoperability and

4   compatibility. In order for all wireless devices to communicate with wireless networks, all Cellular

5   Devices contain a modem chipset – the essential component that allows the device to effectively

6   communicate and transmit voice and data across wireless networks such as Verizon or Sprint.

7       12.     Standard setting organizations ("**SSOs**"), comprised of device and device component

8   developers as well as others, collaborate to set technology requirements to ensure mass interoperability

9   amongst all system components.

10      13.     Because there are so many device designers, component manufacturers, and others

11  involved in the process, every participant in the process must follow uniform standards to ensure the

12  smooth transmission of data between the cellular network and the cellular devices that connect to it.

13      14.     In setting these universal standards for parties to follow, SSOs declare patents that might

14  be essential to those standards ("**standard essential patents**" or "**SEPs**"). SEP holders benefit by

15  obtaining licensing fees and royalties associated with use of their technology – use of which is required

16  in order for their cellular product to be interoperable.

17      15.     Once incorporated into a standard and widely adopted as the standard, that technology is

18  used not always because it is the best or the only option but because the use of that technology has

19  become necessary in order to be compliant with the agreed-upon standard. Consequently, SEP owners

20  have an enormous amount of power in that they have the ability to demand inflated royalties that, if

21  abused, could severely limit competition, consumer choice, and innovation as a whole. Manufacturers

22  are at the mercy of these SEP owners because they require that technology in order to create a competitive

23  product.

24

25      16.     Prior to selecting a standard, SSOs consider various alternative technologies. Most

26  importantly, prior to choosing a standard, SSOs also require that the developers of these standards agree

27  to license their technology on fair, reasonable, and nondiscriminatory ("**FRAND**") terms.

28

CLASS ACTION COMPLAINT

17.    FRAND terms ensure that competitors may use the SEP's technology, and that device manufacturers may use the technology without being subjected to unilateral, unreasonable terms by the powerful SEP-holder. It is in the SEP owners' best interest to agree to FRAND as well, because if they do not agree to FRAND terms, SSOs may exclude their technologies from the standard. Agreeing to FRAND commitments will allow SEP holders to benefit through the license fees and royalties that flow in as a result of being the holder of an SEP implemented in a standard.

**B.    Qualcomm's Anticompetitive Practices In The Wireless Industry**

1.    Qualcomm Has Historically Maintained a Powerful Patent Portfolio in Mobile CDMA and LTE Technologies

18.    Virtually all wireless companies have patent licenses with Qualcomm, and one of the most profitable and lucrative portions of Qualcomm's patent portfolio is for CDMA (Code-Division Multiple Access) technology (which are several protocols used in 2G (second-generation) and 3G (third-generation) standards).

19.    Not only does Qualcomm holds a monopoly power over the CDMA market, it enjoys monopoly power over the LTE (Long Term Evolution or fourth-generation ("4G")) market at well. As a result, Qualcomm charges monopoly prices to manufacturers who need to purchase CDMA processors.

20.    As the chart below (prepared by the Korea Fair Trade Commission ("**KFTC**") shows, Qualcomm's market share between 2012 and 2014 for CDMA technology was consistently over 90%. Even at its lowest point during those years, Qualcomm commanded an 85% share of LTE technologies in 2014.

<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)>

| | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|---|---|---|---|---|---|---|---|---|
| LTE | - | - | 34.2% | 58.8% | 94.5% | 96.0% | 84.8% | 69.4% |
| CDMA | 98.4% | 97.6% | 96.4% | 94.3% | 92.4% | 93.1% | 91.6% | 83.1% |
| WCDMA | 38.8% | 47.4% | 45.7% | 55.0% | 50.4% | 53.9% | 48.8% | 32.3% |

\* Source: Strategy Analytics

21.    Additionally, Qualcomm holds numerous patents related to this standard. As a result, nearly any company that manufacturers CDMA products—be they chipsets, phones, or infrastructure

gear—must obtain a license from Qualcomm. Not only do licensees have to pay a fee to access Qualcomm's patent portfolio, they must pay royalties calculated on the final product (for example, a mobile phone) as well.

22.    Qualcomm also led the way when Fourth Generation wireless systems were introduced ("4G" or "LTE") because Qualcomm exclusively supplies multimode CDMA-LTE chipsets that are backwards-compatible[3] with CDMA. Qualcomm is even beginning to create the foundation for the fifth generation wireless system ("5G"), and will predictably further entrench their market shares in the SEP licensing market and modem chipset markets once again. States CEO Steve Mollenkopf: "While others have been talking about 5G, we have been creating it."[4]

2.    Qualcomm's Clear Violation of its FRAND Promises

23.    As previously mentioned, in order to have their technology utilized in these standards, Qualcomm agreed – to SSOs and to the public[5] – to accept FRAND obligations.

24.    However, as numerous regulatory actions in countries around the world have confirmed, Qualcomm has not kept its FRAND obligations. Qualcomm's promises to comply with its FRAND obligations induced the SSOs to utilize its technology in the cellular technology standards relevant to this action. These promises constituted deceit and fraud on the SSOs and has consequently injured Plaintiffs and others that have had to pay artificially high prices for cellular devices as a result of Qualcomm's unreasonable royalty demands.

25.    Qualcomm has taken advantage of standard-setting process to acquire and maintain monopoly control of the modem chipset market in numerous ways, including:

---

[3] Evolution of cellular communication does not simultaneously change communication standards at once because there are still users of handsets that use the old standard. It takes time to replace base stations and therefore, modem chipsets and handsets have to support not only new standards, but the old standards as well.

[4] Qualcomm's website at https://www.qualcomm.com/invention/5g. Last accessed on February 20, 2017.

[5] Qualcomm announced that it "had a long standing policy of broadly offering to license its standards essential patents for CDMA-based telecommunications standards on terms and conditions that are fair, reasonable, and free from unfair discrimination (FRAND), subject to reciprocity." Qualcomm's LTE-WiMax Patent Licensing Statement at http://techipminnovationfrontline.blogspot.com/2009/05/lte-patent-licensing-contenders.html.

CLASS ACTION COMPLAINT

(a) refusing to license (or alternatively imposing onerous restrictions on licenses of) its SEPs to competing chipset makers;

(b) conditioning the supply of its CDMA chipsets on agreeing to Qualcomm's entire patent portfolio's license agreements;

(c) entering into exclusive deals with certain cellular phone manufacturers such as Apple, Inc. ("**Apple**"); and

(d) most egregiously, ignoring the requirements of SSOs to license its SEPs to patent users on FRAND terms in order to successfully extract unreasonably high, unilaterally-determined royalty payments.

26.    Moreover, with its controlling monopoly over CMDA technology, Qualcomm can and does use this as leverage to gain an even greater share of the LTE-chipset market.

27.    Indeed, Qualcomm has leveraged its monopoly power over the supply of these chipsets to force device manufacturers into anticompetitive license agreements. Since these companies need CDMA- and LTE-based chipsets (which are controlled by Qualcomm) to be able to operate with CDMA- and LTE-based networks – the key to connectivity – device manufacturers have no other choice but to accept unreasonable license terms as dictated by Qualcomm.

3.    Qualcomm's Royalty Rates Are Significantly Higher Than Others in the Industry.

28.    Qualcomm's royalty rates of 5% for most CDMA products and 3.25% for more recent LTE-based products are significantly higher than others in the industry. In fact, its royalty rate is easily double that of a number of their competitor's rates.

29.    Qualcomm's basis for which it calculates its rates is manipulative because instead of basing its royalty rates on the value of its contributing technology, Qualcomm bases its rates off of the wholesale price of the end product in its entirety – which is not a reasonable basis for calculating SEP-based royalties.

CLASS ACTION COMPLAINT

30.     Indeed, certain SSOs have stated that a reasonable royalty should be the value attributable to a SEP. Therefore, it should be based on the value that the patented technology contributes to the "smallest salable component of the overall product."[6]

31.     Qualcomm's basis for which it calculates its rates also contributes to the manipulative nature of its royalties because, rather than basing its royalty rates on its contributing technology alone, Qualcomm bases its rates on the entire value of the end product sold. SSOs have held that this type of calculation is unreasonable. A reasonable royalty should be the value attributable to a SEP. In other words, it should be based, among other things, on the value that the patented technology contributes to the "smallest salable component of the overall product."[7]

32.     Qualcomm also manipulates its power in the industry by grouping its SEPs and non-SEPs into one bundled package – requiring manufacturers to license the entire patent portfolio in order to gain access to the technology required to comply with a standard. By putting both SEPs and non-SEPs into one license, Qualcomm avoids its obligation to set license terms on a FRAND basis because unlike SEPs, non-SEPs do not have to abide by FRAND.

33.     This leaves Qualcomm free to charge excessively high royalties on an entire patent portfolio – which has resulted in massive profits. Indeed, Qualcomm's licensing division brings in the vast majority of its profits:

**Qualcomm's Licensing Profit Takes Off**
Chipmaker's profits increasingly depend on patent income
■ Licensing Profit   ■ Chip Unit Profit

Source: Bloomberg data

Bloomberg

---

[6] "IEEE Amends its Patent (FRAND) Policy" by Dennis Crouch, PatentlyO (February 9, 2015) at http://patentlyo.com/patent/2015/02/amends-patent-policy.html. Last accessed on February 6, 2017.
[7] Id.

34.    Qualcomm's power in the modem chipset market allows it to unfairly leverage its position to force licensees to pay inflated rates on an unreasonable rate basis, which results in an increased royalty payment that has nothing to do with the actual value attributable to Defendants' technologies and intellectual property – to the harm of all purchases of Cellular Devices throughout the world.

**C.    Qualcomm's Conduct Has Been Investigated And Fined By Competition Regulators Throughout The World**

35.    As described in more detail below, these foreign regulatory agencies have harshly concluded – or are about to conclude – that Qualcomm's conduct as alleged herein in this complaint is monopolistic, unfair, and injurious to consumers.

36.    In the last few years alone, Qualcomm's royalty and licensing practices have been investigated by competition regulators in China, Korea, Taiwan, and the United States.

37.    **China:** On February 9, 2015, China's National Development and Reform Commission ("**NRDC**") found Qualcomm's conduct violated China's Anti-Monopoly Law and imposed a record-breaking fine of $975 million. Qualcomm was also ordered to reduce its royalty calculation by basing it off of a portion of the wholesale price of the device rather than the whole.

38.    **Korea:** In July of 2009, the KFTC fined Defendant Qualcomm US$208 million for abusing its dominant share of the chipset market and the SEP license market, and ordered the company to end its unfair licensing practices with respect to the same.

39.    Incredulously, Qualcomm was undeterred, and in December 2016, after a three-year investigation, the KFTC issued a decision imposing a fine of US$854 million against Defendant Qualcomm in its largest fine ever levied for limiting chip markers' access to its patents, and for coercing mobile-phone manufacturers into unfair license agreements by refusing to supply crucial phone chips to those that disagreed with its terms.

40.    Indeed, the KFTC concluded that Qualcomm's control over the chipset market "is a structure under which handset companies have to bite the bullet and accept Qualcomm's license terms,

even if they are unfair, because if the modem chipset supply is suspended, handset companies would face the risk of their entire business shutting down."[8]

41.     **Taiwan:** In December 2015, the Taiwan Fair Trade Commission ("**TFTC**") began its investigation into whether Qualcomm's licensing behavior violate the Taiwan Fair Trade Act and whether Qualcomm's royalty charges are unreasonable.

42.     **United States**: Most recently, as previously mentioned, the FTC filed an enforcement action in this Court seeking a permanent injunction against Qualcomm to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a). The FTC Complaint alleged, among other things, that Qualcomm:

> (a) withheld its baseband processors unless a customer accepts a license to standard-essential patents on terms preferred
>
> (b) by Qualcomm; continually refused to license its SEPs to its competitors, in direct violation of Qualcomm's FRAND commitments; and
>
> (c) entered into exclusive dealing arrangements with companies such as Apple Inc., which denied other baseband processor suppliers the benefits of working with a significant cell phone manufacturer and hampered their development into effective competitors.

**D.     Plaintiff And The Classes Were Harmed As A Direct Result of Qualcomm's Monopolistic Conduct**

43.     Qualcomm has abused its monopoly power to force device manufacturers and other licensees to pay excessively high royalties, which has directly resulted in harm to Plaintiffs and the Class. In the absence of Qualcomm's monopolistic activity in a free, unregulated market, Plaintiffs and members of the Class would have paid less for their Cellular Devices.

44.     Qualcomm and Plaintiffs are all participants in the Cellular Device market.  Plaintiffs are consumers of such devices, and Qualcomm licenses the critical technology required to operate these

---

[8] KFTC's Report (p. 11): "As Qualcomm coerces the execution and performance of patent license agreements by using modem chipset supply as a weapon, FRAND commitment that restrains abuse of dominance in the SEP license market is in effect debilitated.

CLASS ACTION COMPLAINT

Cellular Devices – and forces monopoly rents tied directly to the entire wholesale price of the Cellular Devices at issue in this litigation. Plaintiffs are unable to use the Cellular Devices at issue in this litigation, Plaintiffs would be unable to use their Cellular Devices. Therefore, Qualcomm's anticompetitive acts directly increased the price of the Cellular Devices paid by Plaintiffs. Without the licenses by Qualcomm, Plaintiffs are unable to use the Cellular Devices at issue in this litigation.

45.     As a result of Defendant's unlawful behavior, Plaintiffs and members of the Class have been forced to pay supra-competitive prices for Cellular Devices. Had Qualcomm not abused its monopoly power and instead charged a fair and reasonable royalty as their FRAND commitments called for, consumers throughout the world would have paid less for their Cellular Devices.

46.     If Qualcomm were required to stop abusing its monopoly power and instead charge a fair market royalty, consumers would receive better prices when purchasing Cellular Devices.

## VI.    ANTITRUST INJURY

47.     Defendant's unlawful abuse of its monopoly had the following effects, among others:

    (a) Price competition has been restrained or eliminated with respect to Cellular Devices;

    (b) Prices of Cellular Devices have been raised to artificially inflated levels;

    (c) Purchasers of Cellular Devices have been deprived of free and open competition; and

    (d) Purchasers of Cellular Devices – including Plaintiffs – paid artificially inflated prices.

48.     During the Class Period, Plaintiffs and the Classes paid supra-competitive prices for Cellular Devices. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for Cellular Devices than they would have paid in the absence of Defendant's conduct, and as a result have suffered damages. This is precisely the type of antitrust injury that the antitrust laws were meant to prevent and punish.

CLASS ACTION COMPLAINT

# VII.   MARKET DEFINITION

49.     The relevant geographic market for purposes for this action is the United States and its territories.

50.     The relevant product markets are:

>   (a) the CDMA and premium LTE modem chipset markets ("Modem Chipset Market"); and

>   (b) intellectual property rights associated with SEPs ("SEP Licensing Market).

51.     Qualcomm encumbers Cellular Devices through its licenses and related royalty fees, thereby directly participating in the market for the sale of Cellular Devices to Plaintiffs and Class Members. To be more specific, Qualcomm calculates its royalty payments based off a percentage of the wholesale price of the Cellular Devices purchased by Plaintiffs, which consequently increases the retail price of those Devices – to the loss of consumers worldwide.

52.     Plaintiffs' injuries are inextricably intertwined with Qualcomm's anticompetitive activity because it directly causes an increase in Cellular Device price. Additionally, Qualcomm's conduct eliminates competition (allowing them to further charge supracompetitive prices for its chipsets and licenses) and boxes manufacturers into a position where they must accept Qualcomm's unilateral licensing terms (including excessive royalties) – because they have no other choice.

# VIII.   CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking damages, equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

>   All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") for their own use and not for resale from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities; and (c) any judges or justices involved in this action and any members of their immediate families or their staff.

54.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages or monetary relief pursuant to California state antitrust, unfair competition, and consumer protection laws on behalf of the following class (the "Damages Class"):

> All persons and entities in the United States who purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA- and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 17, 2013 through the present. This class excludes: (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; (d) any judges or justices involved in this action and any members of their immediate families or their staff.

55.     The Nationwide Class and the Damages Class are referred to herein as the "**Classes**."

56.     **Numerosity:** While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs can confidently allege that there are millions of members in each Class given the ubiquity of Cellular Devices in use today.

57.     **Commonality:** Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

58.     Additionally, common questions of law and fact exist as to all members of the Classes. Such questions of law and fact common to the Classes include (but are not limited to):

> (a) Whether Qualcomm willfully acquired or maintained monopoly power over the Cellular Device Components in the United States during the Class Period;

(b) Whether Qualcomm possessed monopoly power in the Modem Chipset Market (underlying the Cellular Device Components) in the United States during the Class Period;

(c) Whether Qualcomm attempted to possess monopoly power in the modem chipset market (a critical market underlying the Cellular Device Components) in the United States during the Class Period;

(d) Whether Qualcomm possessed monopoly power in the SEP Licensing Market (for licenses critical to the technology underlying the Cellular Device Components) in the United States during the Class Period;

(e) Whether Qualcomm tied the sale of its SEPs with the purchase of its non-SEPs;

(f) Whether the conduct of Qualcomm, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g) The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

(h) The appropriate damages, injunctive and related equitable relief for the Nationwide Class; and

(i) The appropriate class-wide measure of damages for the Damages Class.

59.     **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid supracompetitive prices for Cellular Device purchases.

60.     **Adequate Representation:** Plaintiffs are represented by counsel who are highly competent and experienced in the prosecution of antitrust and class action litigation.

61.     **Superiority:** Class action treatment is the superior method for the fair and efficient adjudication of the controversy because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum at the same time without the duplication of evidence, effort, and expense that numerous individual actions would require.

CLASS ACTION COMPLAINT

62.    The benefits of proceeding with this action through the class mechanism substantially outweigh any difficulties that may arise in management of this class action. For example, it provides injured persons with a method for obtaining redress for claims that it might not practicably be able to pursue individually.

63.    This class action method also benefits Defendant in that it ensures a uniform, standard of conduct for Defendant to follow, rather than increasing the possibility of having to face inconsistent results from numerous, individual lawsuits.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

64.    Plaintiffs incorporate all the above allegations as if fully set forth herein.

65.    Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

66.    Qualcomm has historically maintained monopoly power in the Modem Chipset Market, which is particularly significant because there are significant barriers to entry. Indeed, competitors have little to no chance to enter and compete to lower pricing against Qualcomm. Since Qualcomm controls the SEPs underlying CDMA technology and the market as a whole, Qualcomm has can effectively require purchasers of its chipsets to agree to the onerous terms of its patent portfolio licenses. Qualcomm's terms are unreasonable and unlawfully violate its FRAND commitments at consumers' cost worldwide.

67.    Qualcomm also holds a monopoly in the SEP Licensing Market. With SSOs implementing standards that utilize Qualcomm's technology – and with no other substitutes available after a standard is chosen – Qualcomm's chipsets have become critical for operability.

68.    Holding this market power over the SEP licensing market enables Qualcomm to leverage its control of its patents and force manufacturers to agree to unfair and unreasonable license agreements and terms – including excessive royalties.

69.     Qualcomm has acquired and maintained its market power in the Cellular Device Components described above through anticompetitive means—among other things, excluding competitors and forcing manufacturers to agree to non-FRAND terms.

70.     Each relevant cellular device sold with or based on Qualcomm technology is also burdened by Qualcomm's exorbitant royalties – which in turn increases the cost of the device for consumers like Plaintiff. There is no procompetitive justification for the Qualcomm's conduct.

71.     Qualcomm fraudulently induced SSOs to utilize its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations. By violating these obligations, Qualcomm has likely hindered the development of cellular technologies because it forced out competitors, innovation, and the possibility of competitive pricing.

72.     Plaintiffs and the Class were harmed as a direct result of Qualcomm's conduct because it artificially increased the purchase price of their Relevant Cellular Devices. Qualcomm's conduct also harmed innovation and competition – which consequently also harmed Plaintiffs in the quality and price of their Cellular Devices.

## SECOND CLAIM FOR RELIEF

### Violations of the Cartwright Act; Cal. Bus. & Prof. Code §§ 16700, *et. seq*

73.     Plaintiffs incorporate all the above allegations as if fully set forth herein.

74.     During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code sections 16700, *et seq.*

75.     Despite its FRAND obligations, Qualcomm imposed royalty rates that were unreasonable and exceeded what it could have obtained in negotiation complaint with FRAND commitments.  This conduct constitutes a "combination" under the Cartwright Act.

76.     Qualcomm established and carried out an unlawful scheme by which it acquired and maintained monopoly power in the modem chipset market and SEP licensing market through anticompetitive means, including by excluding competition.

CLASS ACTION COMPLAINT

77.    As a direct result of Qualcomm's unlawful conduct, Plaintiffs and the Class were overcharged when they purchased their Relevant Cellular Devices, which are commodities.

78.    It is appropriate to apply California antitrust law to the Nationwide Class because Qualcomm is headquartered in California and Qualcomm subjected its competitors as well as manufacturers that reside and do business in California to its unlawful conduct. As a direct result, a large portion of Qualcomm's profits were derived from companies doing business in California.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to each and every member of the Class;

2.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act, and the state antitrust and consumer protection laws set forth herein;

3.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

4.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

5.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.    Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits defendants obtained as a result of their acts of unfair competition;

7.    Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.    Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

Dated: March 3, 2017                    Respectfully submitted,

                                        **PRITZKER LEVINE LLP**

                                        By:    _/s/ Elizabeth C. Pritzker_
                                               Elizabeth C. Pritzker

                                        Elizabeth C. Pritzker
                                        Jonathan K. Levine
                                        Bethany Caracuzzo
                                        180 Grand Avenue, Suite 1390
                                        Oakland, California 94612
                                        Telephone: (415) 692-0772
                                        Facsimile: (415) 366-6110
                                        ecp@pritzkerlevine.com
                                        jkl@pritzkerlevine.com
                                        bc@pritzkerlevine.com

                                        *Attorneys for Plaintiffs*

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury for all issues so triable under the law.

Dated: March 3, 2017                    Respectfully submitted,

                                        **PRITZKER LEVINE LLP**

                                        By:    _/s/ Elizabeth C. Pritzker_
                                               Elizabeth C. Pritzker
                                               *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT